WILLIAMSBURG FAIR HOUSING
COMMITTEE et al., Plaintiffs,

v.

NEW YORK CITY HOUSING AUTHOR-
ITY et al., Defendants,

and

United Jewish Organizations of
Williamsburg, Inc., et al.,
Intervenors-Defendants.

UNITED JEWISH ORGANIZATIONS OF
WILLIAMSBURG, INC., et al.,
Third-Party Plaintiffs,

v.

KENT VILLAGE HOUSING CO., INC.,
et al., Third-Party Defendants.

No. 76 Civ. 2125 (CHT).

United States District Court,
S. D. New York.

July 14, 1980.

---

Puerto Rican Legal Defense & Ed. Fund, Inc. by Jorge L. Batista, Robert Hermann, Peter Bienstock, Henry A. Fernandez, Teitelbaum & Hiller by Herbert Teitelbaum, Community Action for Legal Services by Ira S. Bezoza, New York City, for plaintiffs.

Paskus, Gordon & Hyman by Harlan J. Funk, John A. Rayll, Jr., Marc Jacobson, New York City, for defendants Ross-Rodney Housing Corp. and Kraus Management, Inc.

Cohn, Glickstein, Lurie, Ostrin & Lubell by Richard Birnbaum, Jonathan W. Lubell, New York City, for third-party defendants Kent Village Housing Co., Inc., et al.

Feder, Kaszovitz & Weber by Gabriel Kaszovitz, New York City, for intervenors-defendants.

John S. Martin, Jr., U. S. Atty., S. D. N. Y. by Richard J. McCarthy, Dennison Young, Jr., Asst. U. S. Attys., New York City, for U. S. Dept. of Housing and Urban Development.

Alan G. Schwartz, Corp. Counsel, by Lloyd A. Deutsch, Asst. Corp. Counsel, New York City, for Dept. of Housing Preservation and Development of the City of New York.

Donald Schatz, Gen. Counsel, New York City Housing Authority, New York City, for New York City Housing Authority and Joseph C. Christian; Jeanne Hollingsworth, New York City, of counsel.

## OPINION

TENNEY, District Judge.

In May 1976, plaintiffs commenced this action to seek redress for alleged discrimination in housing in the Williamsburg section of Brooklyn. They sued under Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631 ("Title VIII"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. ("Title VI"), 42 U.S.C. §§ 1981–1983, and 24 C.F.R. § 1.4(b)(2)(ii), as well as under the equal protection clause of the fourteenth amendment. After extensive negotiations and commendable effort, the parties resolved most of the issues in the case by formulating and agreeing to a Consent Decree. Only one group of defendants opposed the Court's approval of the Consent Decree: Kraus Management, Inc. and Ross-Rodney Housing Corp., manager and owner respectively of the Bedford Gardens development ("Bedford Gardens defendants"). They opposed approval of the Consent Decree, not only against themselves, but against other parties. By Memorandum dated May 5, 1978, 450 F.Supp. 602 (S.D.N.Y.1978), the Court approved the entry of the Consent Decree against the consenting parties.

By order to show cause, plaintiffs had previously moved for injunctive relief against the Bedford Gardens defendants. Hearings focusing on those defendants concluded on May 11, 1978. At that time the parties agreed to consolidate the hearing on the preliminary injunction motion with a trial on the merits pursuant to Federal Rule of Civil Procedure ("Rule") 65(a)(2). Over the course of the summer of 1978 the parties filed post-trial memoranda. During that time and to date, all parties—by Court order or by representation to the Court—have been acting pursuant to the Consent Decree. The Court now addresses whether the Bedford Gardens defendants should be declared to have violated applicable laws against housing discrimination and whether, if so, they should be enjoined from further violations.

For the reasons given below, the Court concludes that the Bedford Gardens defendants have discriminated in the rental of Bedford Gardens in violation of section 3604 of Title VIII, Title VI, 42 U.S.C. § 2000d, 42 U.S.C. §§ 1981 & 1982, and applicable rules and regulations. The Court directs the Bedford Gardens defendants to act pursuant to the terms of the Consent Decree that has been in force against the consenting parties.

## BACKGROUND

### Procedural History[1]

On May 11, 1976 plaintiffs brought on this action by complaint and order to show cause. They sought a preliminary injunction to prevent the New York City Housing Authority ("NYCHA") and its chairman from using race, religion or national origin in renting apartments in publicly assisted housing in Williamsburg.[2] Plaintiffs were the Williamsburg Fair Housing Committee ("WFHC"),[3] Division Avenue Tenants Association,[4] and Puerto Rican or other Hispanic and Black residents or former residents of

1. Most of the history that follows is also set out in *Memorandum and Order, dated May 5, 1978,* reported at 450 F.Supp. 602, 603–05 (S.D.N.Y. 1978).

2. The Consent Decree part I(1) describes the subsidy programs as follows:
 (r) "Section 212 rental assistance payments" means rental subsidies received by or on behalf of tenants in dwelling units pursuant to Section 212 of the Housing and Development Act of 1974, 88 Stat. 672, *as amended,* 12 U.S.C. § 1715z–1.
 (s) "Section 23 leased housing" means dwelling units whose tenants receive the benefit of rental subsidies pursuant to Section 103(a) of the Housing and Urban Development Act of 1965, 79 Stat. 455, *amending* United States Housing Act of 1937, *as amended,* 42 U.S.C. § 1421b.
 (t) "Section 236 interest reduction payments" means mortgage interest subsidies made pursuant to Section 236 of the National Housing Act of 1934, *as added by* Section 201(a) of the Housing and Urban Development Act of 1968, 82 Stat. 476, *as amended,* 12 U.S.C. § 1715z–1.
Herman Kraus, sole shareholder and president of Ross-Rodney Housing Corp. and president of Kraus Management, testified that the section 236 program, since phased out, provided an interest subsidy. Its function was to reduce the market interest to 1%. The savings in interest was supposed to be sufficient to reduce the level of rent to meet the needs of those with low and moderate incomes. The interest subsi-

dy proved insufficient. The section 212 rental assistance payments program ("RAPP"), known as a piggyback subsidy, was created. The RAPP subsidy allowed a person to pay only a certain percentage of his income for rent. The federal government paid the balance. Tr. 217–18.
Kraus further explained that the section 23 leased-housing program involved a contract between the landlord and the NYCHA. The NYCHA leases some apartments and guarantees payment for the rent on those apartments. It would find the prospective renters and rent to them at whatever the NYCHA requires. It pays the difference that the federal government would pay under the section 212 program. The federal government funds the leasing program through the city. Tr. 218–19.

3. Plaintiffs describe the WFHC as an association of Puerto Rican, other Hispanic and Black community groups in the Williamsburg area. Its purpose is to promote equal housing opportunity in the Williamsburg community. Complaint ¶ 8.

4. Plaintiffs describe the Division Avenue Tenants Association as a "non-profit corporation, chartered pursuant to the New York State Not-For-Profit Corporation Law, whose object is to promote equal housing opportunity for Puerto Rican, other Hispanic and Black individuals living in the vicinity of Division Avenue, Brooklyn." Complaint ¶ 9.

Williamsburg. They sought to represent non-White persons who had been denied dwelling units or housing subsidies in five Williamsburg housing developments: Jonathan Williams Plaza, Independence Towers, Taylor-Wythe Houses, 115–123 Division Avenue and Bedford Gardens. Plaintiffs alleged that the NYCHA was responsible in whole or part for the renting of apartments at these five developments and that, in renting them, the Authority was discriminating against non-Whites.

Shortly thereafter, the United Jewish Organizations of Williamsburg ("UJO") and various individuals intervened as defendants in the main action. They sought to represent White families with existing leases at Bedford Gardens or with priority rights to Bedford Gardens apartments.[5] UJO and one individual commenced a third-party action against Kent Village Housing Co. and Los Sures Management Co., owner and manager respectively of Roberto Clemente Plaza. They also brought in as third-party defendants the United States Department of Housing and Urban Development ("HUD") and its Secretary, who allegedly ignored their responsibility to police and supervise the housing project sponsor's efforts to comply with the approved marketing plan and to enforce HUD's regulations regarding priorities in tenant selection. Finally, they sued the Housing and Development Administration of the City of New York, since renamed the Department of Housing Preservation and Development (for consistency, referred to as "HDA"), which had responsibility for supervising tenant selection at Clemente Plaza in compliance with its regulations and federal laws and regulations. The Court approved the third-party action, consolidated it with the main action, and joined HUD and its Secretary as defendants in the main action. Memorandum and Order dated December 10, 1976.

On June 2, 1976, after the intervention of UJO, plaintiffs filed an Amended Complaint, adding the Bedford Gardens defendants. The Court approved the joinder of these defendants. Memorandum and Order dated December 20, 1976.

During the earlier stages of this litigation, the Court entered a series of orders regarding renting at the housing developments. Initially, the Court issued temporary restraining orders against renting apartments in the developments pending a hearing. Orders of May 11 and May 26, 1976. In June the Court concluded that continuing the restraining orders would cause irreparable damage to the City. Accordingly, it vacated the May restraining orders. Memorandum and Order dated June 7, 1976. The Court also noted that the Community Relations Service of the United States Department of Justice had offered to mediate among the parties to this dispute. The Court believed that this "dispassionate service, trained and experienced in dealing with racial disputes in urban communities," could assist the parties in reaching an accord without unnecessary financial loss. *Id.* at 3. Mediation followed and continued throughout the latter part of 1976. All parties participated except the Bedford Gardens defendants.

In December 1976 the first buildings in Clemente Plaza received certificates of occupancy. UJO then sought and obtained a temporary restraining order against discriminatory renting in Clemente Plaza. After granting the TRO on December 6, the Court held six days of hearings on the motion for a preliminary injunction. The Court concluded that mediation still offered the best hope for a satisfactory resolution of this dispute. Interim Order dated December 23, 1976. Accordingly, the Court adjourned the hearings and, in addition, issued interim orders regarding renting at Clemente Plaza. *Id.*

All parties except the Bedford Gardens defendants then resumed settlement negotiations. By summer they had reached an agreement and embodied it in a proposed Consent Decree. The Bedford Gardens defendants would not consent to participation in the Decree. At the Court's request, those defendants prepared a version of the

---

**5.** See n.11 *infra* regarding priority rights.

proposed Consent Decree satisfactory to them. In September, they submitted an "Amended Proposed Consent Decree." In October, the community parties indicated that they would not accept the Bedford Gardens defendants' modifications.

On November 8, 1977 plaintiffs sought approval of the proposed Consent Decree as to consenting parties. They also sought a temporary restraining order and a preliminary injunction limiting rental at Bedford Gardens. On December 1, 1977, the Court directed interim compliance with the terms of the proposed Decree by all parties except the Bedford Gardens defendants. The Court noted that the Bedford Gardens defendants had represented that, pending the return date of the order to show cause, they would act in accordance with the terms of their "Amended Proposed Consent Decree."

In a further Order, dated February 14, 1978, the Court restated the December 1 Order directing interim compliance with the Consent Decree. In the February Order, the Court also directed that notice of the Consent Decree be published, set a date for a hearing on the Consent Decree and on the preliminary injunction sought against the Bedford Gardens defendants, and certified the plaintiff class for purposes of declaratory and injunctive relief but not at that time for ancillary monetary relief.

On April 18, 1978, the Court held a hearing on the Consent Decree. Only the Bedford Gardens defendants appeared in opposition to the Decree; they filed a brief. The preliminary injunction hearing was adjourned until May 4, 1978.

On May 5, 1978, the Court issued a Memorandum approving the Consent Decree against all consenting parties. 450 F.Supp. 602 (S.D.N.Y.1978). The Court examined the Consent Decree in view of the preference under the Fair Housing Act of 1968 for settlements. *Id.* at 605. Such settlements are especially important where the housing patterns of an entire community are involved. *Id.* at 606.

Paragraph six, the core of the Consent Decree, proposed enjoining discrimination in rentals at the six developments and pre-scribing the use of race, color, religion, sex or national origin in such rentals. The parties recognized, however, that prior to barring the use of such criteria entirely, it was necessary to have interim "adjustment periods" to achieve better integration. Once a certain percentage of White to non-White was reached for a particular project, use of such criteria would be barred. The Consent Decree also provided mechanisms for resolving disputes without continuous court supervision and mechanisms to ensure that information on all developments reached all groups.

The Court found that the Consent Decree had been validly entered and that its terms were neither unlawful, unjust, unreasonable, nor inequitable. *Id.* It also found that the Decree embodied the goal of integrated residential housing patterns. *Id.* at 607. The only opposition to the approval of the Consent Decree came from the Bedford Gardens defendants. The Court considered and rejected their arguments, including their contention that approval of the Decree would prejudice the Court on the preliminary injunction motion. The Court concluded that its approval of the Consent Decree would neither prejudice the Court as to the liability *vel non* of the Bedford Gardens defendants nor foreclose arguments on the appropriate relief. Finally, the Court found that further delay in the approval of the Consent Decree as to the consenting parties would be detrimental to the spirit of community cooperation responsible for the Consent Decree. *Id.* at 607–08.

## THE EVIDENCE

*The Parties' Summaries of the Evidence*

Immediately after approving the Consent Decree against all consenting parties, the Court resumed the hearing on the preliminary injunction motion. The renewed hearing focused on the Bedford Gardens defendants. After completion of the hearing, which took five days in May 1978, the parties consented to consolidation of the hearing with the trial on the merits.

Plaintiffs' version of the evidence admitted at the May trial may be summarized as follows. Bedford Gardens is a 639-unit publicly assisted housing development in the Williamsburg Urban Renewal Area ("WURA") in Brooklyn. It is owned by Ross-Rodney and managed by Kraus Management. Herman I. Kraus is the sole shareholder of Ross-Rodney and the president of Kraus Management. He establishes those companies' policies. In January 1974 Kraus conceived of a quota for Bedford Gardens and committed it to writing. He designated 75% of each building, apartment size, and subsidy program for Whites, 20% of each category for Hispanics, and 5% for Blacks. He directed Arthur Millman, then director of Kraus Management, to rent according to the quota. Millman and his staff succeeded. The quota was used until at least a year after the litigation began; the Bedford Gardens defendants abandoned it only on the advice of counsel and only after the lawsuit had focused on Bedford Gardens. According to the plaintiffs, the evidence further establishes that the Bedford Gardens quota did not reflect the composition of the WURA or any other relevant neighborhood population. Kraus knew that the population from which applicants were drawn was evenly divided between Whites and non-Whites.

In addition, Kraus allegedly ignored applicants' claims to priorities under the subsidy programs or accepted HDA's representations that it would attend to the claims for priorities. HDA did not do so. In fact, Kraus reserved 81 of the apartments under section 212[6] subsidies for families recommended by the UJO. The UJO was the only group given such preferences, and it received them because Kraus had a business relationship with it.

Finally, the plaintiffs contend that the evidence establishes that the Bedford Gardens defendants sometimes acted independently and sometimes in concert with others, but, in either case, illegally at all times that the quota was in force. HDA was not involved in the elaborate planning to achieve the quota in each building, apartment size, and subsidy program. HDA considered the percentages (75/20/5) to be merely goals and did not permit their use as rigid quotas. The evidence of HDA's complicity regarding UJO's involvement in the rental process is substantial, but the record is without documentation to support the Bedford Gardens defendants' claim that HDA was responsible for the quota at Bedford Gardens. The evidence also establishes that the WFHC consistently opposed the use of a quota at Bedford Gardens.

The Bedford Gardens defendants present a different version of the evidence. Under their version, the ethnic ratio was established by governmental authorities to promote integration in the WURA. The Bedford Gardens defendants followed the ratio. More specifically, they begin by pointing to a changing ethnic composition in the WURA. Over the years, the number of Whites declined and the number of Hispanics increased. Against this backdrop, the HDA and the NYCHA, which were responsible for insuring integration in the WURA, approved different ethnic ratios for the various publicly assisted housing developments. Allegedly, each ratio was approved as a goal and accepted by the competent authorities: HDA, NYCHA and/or HUD. The Hispanic community in the WURA also accepted the ratios at the developments, including the Bedford Gardens ratio because it was balanced by the largely non-White ratio at Clemente Plaza. All parties and community groups monitored, without opposing, the Bedford Gardens ratio. The community agreement on these ratios broke down after Bedford Gardens was almost completely rented.

According to the Bedford Gardens defendants, the Bedford Gardens ratio called for ethnic breakdowns by building and floor, a practice established to promote integration. This rental practice approximated the ethnic goals, but did not fit them rigidly. Under it, individuals with priorities filed preliminary applications. The applica-

---

**6.** See n.2 *supra*.

tions were forwarded to the Bedford Gardens defendants, who assigned numbers to the applications in the order that the applications were received from HDA. A preliminary applicant who qualified on the basis of family size and income levels was then invited to file a regular application.

The Bedford Gardens defendants contend that no evidence was introduced regarding the ethnicity of the 500 applicants obtained to complete the rental of Bedford Gardens. There is no evidence, they further contend, of any discrimination in these applications, and plaintiffs have not presented a scintilla of evidence that anyone was denied an apartment to meet the ethnic goals. The record shows only that the 75/25 ratio was achieved at Bedford Gardens as well as at two other projects.

After the action was commenced, the Bedford Gardens defendants continued to rent according to the ethnic goals. In January 1977, on the advice of counsel, they stopped renting at the HDA ratio and began renting on a first-come, first-serve basis. In November 1977, they began renting in accordance with the proposed Consent Decree, which meant renting predominantly to Minorities rather than Whites. Little or no change in the ethnic ratio resulted.

*The Evidence*

During the trial, the Court heard testimony from Arthur Millman, former director of management for Kraus Management; Herman Kraus, chief executive officer of Kraus Management and Ross-Rodney Housing Corp.; Betty Sargeant, an employee of HDA's Office of Equal Opportunity; Laila Long, Assistant Commissioner of HDA's Office of Equal Opportunity; Douglas Mor-

itz, former secretary of the WFHC and former secretary of the Williamsburg Housing Association; Miriam Kerpen, HDA employee; and Rubin Wolf, former project director for HDA in the WURA. The parties also introduced numerous exhibits, which were added to the many exhibits already before the Court from prior proceedings in this action.

*Arthur Millman*

Arthur Millman, the plaintiffs' witness, was the director of management for Kraus Management from early spring 1975 until April 1977. He testified that his "duties and responsibilities were to direct the operation and management of the multi-family housing that was managed by Kraus Management," including Bedford Gardens. Tr. 8.[7] His supervisor was Herman Kraus, whom Millman consulted on virtually a daily basis. Millman was in charge of the daily "rent-up" of Bedford Gardens.

Millman testified that, prior to the initial rent-up of Bedford Gardens, Kraus instructed him to rent Bedford Gardens 75% to Whites, 20% to Hispanics, and 5% to Blacks. This ratio or quota was to be followed in each building, on each floor, and by each apartment size and public subsidy program.[8] Millman communicated this ratio to his staff, and he and his staff used their best efforts to achieve the ratio. They succeeded in substantially achieving that goal. The Kraus Management monitored itself to ascertain whether the ratio was being met.

In meeting the ratio, Millman and his staff pursued a policy of designating the ethnicity of a particular apartment. When a White family vacated its apartment, only

---

7. "Tr." refers to the transcript of the May 4–11, 1978 trial.

8. The plaintiffs submitted the following summary, representing Feb. 1, 1977 statistics, based on the Bedford Gardens initial move-in roster. Plaintiffs' Memorandum at 9.

| Subsidy | White Families | | Hispanic Families | | Black Families | |
|---|---|---|---|---|---|---|
| | No. | Percent | No. | Percent | No. | Percent |
| § 212 | 97 | 75.2 | 24 | 18.6 | 8 | 6.2 |
| § 23 leased housing | 147 | 77.4 | 35 | 18.4 | 8 | 4.2 |
| § 236 only | 224 | 71.6 | 59 | 18.8 | 30 | 9.6 |
| Total | 468 | 74.1 | 118 | 18.7 | 46 | 7.3 |

a White family would be put into that apartment. At some point in the rental process, Millman and his staff may have for administrative reasons departed somewhat from that policy. A Black family might have been placed in an apartment vacated by a White family. Their main concern was to maintain the 75/20/5 ratio.

The initiative for the ratio, Millman testified, was Kraus Management's. Millman could not recall either the HDA or the NYCHA instructing him to rent at the ratio. The NYCHA leased apartments from Bedford Gardens under the section 23 leasing program.[9] Millman sent the NYCHA a letter to which he attached schedules, prepared in part by Kraus, designating which apartments were NYCHA-leased apartments and the ethnicity of the various apartments. Letter from Millman to Harold Sole, Director of Leased Housing for the NYCHA, dated November 6, 1975, and attached schedules, Plaintiffs' ("Pl.'s") Exh. 31.[10] The NYCHA did rent according to those designations of ethnicity. Millman believes that the NYCHA did not object to Kraus Management's position regarding ethnicity.

Millman also did not recall being urged by Douglas Moritz of the WFHC or by any other Hispanic group to rent at the 75/20/5 ratio, but Millman did perceive some communications from Moritz as an attempt to make sure that Bedford Gardens did not rent at any other ratio. Millman did not recall telling Kraus that Moritz had encouraged Millman to rent at the ratio.

Millman was not aware of any studies of "pools" as bases for the ethnic ratio. In his knowledge, no one in Kraus Management studied the ethnic-racial distribution of the potential applicant pool or of the preliminary applicants or of the families found eligible for section 236 apartments. He never saw or heard of such a study by anyone. He recalled no discussion with Kraus of such pools.

Millman also did not recall whether anyone at Kraus Management exercised independent responsibility to determine priorities of applicants for apartments at Bedford Gardens—priorities listed in the HDA rules and regulations or in section 106 of the Land Disposition Agreement.[11] As far as

9. See n.2 *supra* for an explanation of the public-subsidy programs.

10. Previously, Millman had written Sole:
In accordance with your request made at our meeting of Tuesday, June 24, 1975, we are herewith submitting itemized schedules of the 192 Bedford Gardens apartments leased by the Housing Authority.
The schedules contain for each apartment a building number, an apartment designation, the number of bedrooms, the number of rooms, the floor location and the required tenant ethnic composition. The ethnic composition ratio for Bedford Gardens as approved by the Housing and Development Administration and the Department of Housing and Urban Development is 75% White, 20% Spanish speaking and 5% Black.
The lease agreement between the Housing Authority and the Bedford Gardens Company contains the number and size of the leased apartments which is set forth below together with the ethnic composition.

| 1 Bedroom | 2 Bedrooms | 3 Bedrooms | 4 Bedrooms |
|---|---|---|---|
| 13 | 94 | 71 | 14 |
| (9 White) | (70 White) | (53 White) | (10 White) |
| (3 Spanish) | (19 Spanish) | (14 Spanish) | (3 Spanish) |
| (1 Black) | (5 Black) | (4 Black) | (1 Black) |

You will note that we have distributed the apartments leased by the Housing Authority as evenly as possible throughout the entire housing development.
Letter from Arthur Millman to Harold Sole, dated July 8, 1975, Pl.'s Exh. 30. The November 6, 1975 letter, Pl.'s Exh. 31, provided "an amended final schedule" of the 192 NYCHA-leased apartments.

11. Section 106 of the Agreement Between the City of New York and Ross-Rodney Housing Corp. [Bedford Gardens] for Site 3A of the Williamsburg Urban Renewal Area (referred to in the text as the "Land Disposition Agreement"), Pl.'s Exh. 48a, provides:
106. Priority in the assignment of apartments in the completed project shall be given to eligible applicants in the following order:
1. Former and present site tenants of the site area where the project was constructed.
2. Former and present site tenants of the Williamsburg Urban Renewal Area.
3. Site Tenants of other Title I, Urban Renewal, or public improvement projects situated within the City of New York.
4. Any veteran residing within the City of New York discharged from the Armed Forces of the United States under honorable conditions after August 5, 1964.

he knew, priorities of veterans or priorities of certain applicants for section 212 apartments were not considered. He had thought, however, that HDA would take care of the priorities.

The 75/20/5 ratio was to apply to all apartments, but Millman testified to a departure from that policy regarding four-bedroom apartments. Bedford Gardens contained 48 four-bedroom apartments. Of the 48, 14 were assigned to the NYCHA under the section 23 leasing program. All of the remaining 34 apartments were rented to White families. Of the 48 total, 45 apartments were rented to Whites, 2 to Hispanics, and 1 to a Black family.

Millman's testimony or exhibits that had been prepared by him indicated that, of the 96 apartments under the RAPP subsidy, the most desirable subsidy, 81 apartments were set aside for families recommended by the UJO. Millman recommended that the 81 be set aside for the UJO nominees, and Kraus approved the recommendation. Millman understood that this reservation of 81 apartments meant that he was not to rent that number of RAPP apartments to families other than those recommended by the UJO. The UJO made such recommendations; all of them were for White families.[12] Millman then acknowledged that Kraus had told him that Kraus Management would or could make Bedford Gardens the Hasidic capital of New York.

Kraus Management worked with the UJO in other ways. Although there was some "outreach" effort to inform Hispanics of Bedford Gardens, that effort was not as extensive as with Hasidics. Kraus Management consulted with the UJO throughout much of the rental process. In addition to setting aside the 81 apartments for UJO nominees and more extensive advertising in the Hasidic press, Kraus Management also met more regularly with the UJO than with Hispanic community representatives. Millman testified, however, that Kraus said he would serve on a rental committee only if all community groups were represented. Otherwise, Kraus wanted written direction from an official high in city government that Kraus serve on such a committee. Kraus Management received a letter from Roger Starr, which Kraus interpreted as such written direction.[13] He worked with

---

This section was separately introduced as Pl.'s Exh. 48. Priorities are also set out in HDA's Rules and Regulations Governing City-Aided Limited Profit Housing Companies art. II, § 8(h), HDA Exh. 2.

**12.** In a Memorandum to File from Arthur Millman, dated Dec. 5, 1975, Pl.'s Exh. 42, Millman discussed the initial allocation of RAPP apartments to the UJO. He had met with Wolf of the HDA and Rabbis Lefkowitz and Weinberger of the UJO on December 4, 1975. Millman explained to the group that Kraus Management would permit the UJO to recommend 48 families for the RAPP apartments. After further discussion, Millman agreed to attempt to change Kraus Management's policy to allow the UJO to recommend 70 to 76 families for RAPP apartments. Among the other points of discussion or agreement was that all four-bedroom apartments would be at least temporarily withdrawn from the RAPP program.

In a Memorandum from Arthur Millman to Kraus, dated Dec. 12, 1975, Pl.'s Exh. 43, Millman recommended that the UJO be allowed to recommend 81 applicants for the RAPP-subsidized apartments. The Memorandum is stamped "approved" and bears the initials of Herman Kraus. Millman also testified that

Kraus approved the recommendation. Tr. 31–32.

**13.** The letter provides in part:

At this time, . . . in order to continue community involvement and input in the tenancy of the new units developed on Site 3A, known as Bedford Gardens, and pursuant to Section 106 of the aforementioned Land Disposition Agreement we have determined that the Ross-Rodney Housing Corp. is to work with the United Jewish Organizations during the project's tenanting period. The role of the United Jewish Organizations is to review applications accepted pursuant to provisions more fully described in Section 106 of the Land Disposition Agreement and the applicable Fair Marketing Plan. Should the priorities indicated in Section 106 become exhausted it is expected that the United Jewish Organizations would be able to suggest additional families who might be eligible for units pursuant to applicable income guidelines and the approved Fair Market Plan.

In order that the Housing and Development Administration be able to successfully monitor the actions taken pursuant to the Land Disposition Agreement and Fair Marketing Plan it is requested that representatives of

the UJO and invited UJO and HDA representatives to be present at Bedford Gardens to oversee rentals. Millman recalled no similar discussions about working with representatives of the Hispanic community.

Millman testified that "at some point we were in a dither as to whether to continue our policy [of renting in accordance with the ratio] or whether to change it based upon the current litigation." Tr. 64. He also testified that, despite Kraus Management's renting in accordance with the ratio, he was aware of no eligible applicant's being denied an apartment because of the ratio. Finally, he testified that he recalled discussions with HDA employees about the possibility of violence in regard to Bedford Gardens rent-up. He did not recall the conversations specifically, and he did not recall any specific threats being made regarding the ratio. The Court limited the testimony about the possibility of violence to the issue of Kraus's state of mind.

*Herman I. Kraus*

The Bedford Gardens defendants first called Herman I. Kraus. He testified that he is the sole shareholder and president of the Ross-Rodney Housing Corporation, the legal titleholder to Bedford Gardens. He is also the president of Kraus Management, which manages Bedford Gardens. He has been in the subsidized housing field since its early stages and active in low- to moderate-income housing for thirty years.

He testified that he first became involved with Bedford Gardens in 1973. Some time after assuming the project, he was asked by Mimi Kerpen, an HDA employee, to come to the HDA offices. Kraus and Kerpen discussed the Affirmative Fair Housing Marketing Plan ("Marketing Plan") for Bedford Gardens, HUD Exh. 4. She gave him a packet and told him to complete it. Kerpen told him that he would need to

complete the Marketing Plan, and she gave him the ethnic percentages necessary to complete the plan. The percentages were the 75 (White)/20 (Hispanic)/5 (Black) ratio. She told him that the ratio constituted the required rental statistics at which he would be required to rent Bedford Gardens. "She stated to me that this was based on a policy of operation outreach where the concept was to keep the people who were in the community like Williamsburg there and reach out and bring . . . similar people . . . back to the community." Tr. 151.[14] The ratio was necessary to complete the following question on the Marketing Plan, HUD Exh. 4, ¶ 2: "State what results applicant reasonably expects in terms of occupancy from special outreach efforts." Kraus used the information given him by Kerpen to answer as follows: "As a result of special outreach efforts it is hoped to achieve a tenant mix of 75% White, 20% Spanish speaking, and 5% Black." *Id.* The Marketing Plan was approved on or about May 1974.

Kraus testified that he made no independent judgment as to the rightness or wrongness of using a racial quota as a rental basis and he also testified that he had no trouble using the word "quota." He followed HDA's directions in using the quota. He stated, in substance, that Bedford Gardens would be in default on the mortgage, which was held by HDA, if the Bedford Gardens defendants failed to follow the directions of HDA.

The subject of racial composition next arose, Kraus continued, when Kraus met with representatives of the HDA and the UJO. Rubin Wolf and David Feingold, who Kraus believed to be HDA liaisons, represented HDA. Kraus testified that Wolf told him it would be a good idea to meet with the Hasidic community. The rabbis

---

the Williamsburg Urban Renewal field office, located at 27 Hooper Street, be present as HDA's representatives at any meeting between both the Corporation and the United Jewish Organizations.
Letter from Roger Starr, HDA Administrator, to Herman Kraus, dated July 30, 1975, Bedford Gardens defendants' ("BG's") Exh. E.

14. Plaintiffs objected to Kraus's testimony regarding statements made by Kerpen to Kraus as hearsay. The Court sustained the objection. Tr. 148. The Court will of course not rely on inadmissible testimony, but it sets out this testimony as background to a discussion of the Bedford Gardens defendants' arguments.

representing the UJO asked Kraus how many units at Bedford Gardens would be assigned to each Hasidic congregation. Kraus responded that he was not going to be a party to the meeting, or to any agreement, because all community groups were not represented. The meeting broke up without agreement.

Rubin Wolf pursued the idea of Kraus's working with the UJO. "Rubin Wolf said that the community was quite volatile, and that deals had been made between different groups in the Williamsburg community, and that we would upset those deals [if] we did not not go along with what UJO would request or some of the things that he would recommend from time to time." Tr. 162–63.

In July 1975 Wolf called Kraus to tell him that the HDA wanted to set up a committee with representatives of the HDA, UJO, and Bedford Gardens. Kraus told Wolf that he would not participate in the committee unless all the elements of the Williamsburg community were represented "and that I did not want to be a party to all of the deals that obviously were now for the first time coming through." Tr. 165. Kraus stated that he was told that unless the Bedford Gardens defendants worked with the UJO and within the arrangement made by the community groups, there would be violence. Kraus responded that, if that is the case, he will cooperate, but only if the HDA provided him a directive with someone of high authority in New York City government. Wolf subsequently brought Kraus a letter from Administrator Roger Starr.[15] Kraus wanted a stronger letter, but Wolf said the letter was the only one he could get. Kraus decided to accept the letter and cooperate. Bedford Gardens consequently adopted a "turnstile" approach to rental. "We would have like a gate. The HDA would clear the community people through as to what their priority rights were, as to what the deals were." Tr. 167. Applicants who came through the HDA turnstile would be given apartments on a first-come, first-serve basis, subject only to Bedford Gardens approving them under income, family size, and housekeeping criteria. To facilitate this new approach, Kraus Management put two additional desks in its rental office at Bedford Gardens—one for the HDA monitor and the other for the UJO monitor. If the two monitors did not give their approval with the rubber stamps specially prepared for them, the application would be rejected. If the application was approved, the applicant came to Kraus Management, which would then conduct checks for family size, income, and housekeeping. Bedford Gardens was rented this way thereafter.

Just prior to rent-up of Bedford Gardens, Kraus attended a meeting at HDA. The quota was discussed. Kraus testified that at the meeting Laila Long of the HDA instructed him to follow the quota. Still later, toward the end of 1975, HDA informed Kraus that Bedford Gardens had been awarded a 20% RAPP subsidy, which would piggyback onto the section 236 subsidy. Rubin Wolf of HDA brought Rabbi Weinberger to Kraus's office to discuss how the new RAPP subsidy was going to be allocated. The UJO wanted to know how many RAPP-subsidized apartments the UJO would get. Finally, Kraus gave them 81 RAPP apartments. Wolf instructed him to do so. "If we didn't do it, it would upset a balance that we were not aware of but was going on in the community and we would be responsible for violent actions within the Williamsburg community." Tr. 179–80.

In March 1976, Kraus attended a meeting in Roger Starr's office at the request of Maggie Bergen, Starr's assistant. At the meeting, Bergen asked Kraus how Bedford Gardens was doing in regard to the quota. Kraus reported that "[w]e are right on the button." Tr. 182. "[T]here was just a perceptible sigh of relief that went throughout the meeting." Kraus testified that Starr and Bergen responded: "For God's sake, Herman, keep it that way; don't let it go over. We have all kinds of problems from

---

**15.** The letter is set out in part at n. 13 *supra.*

the Spanish community and if you allow it to go past that, we are going to have a volatile situation." *Id.* When Kraus was leaving, Starr reportedly told him, "[k]eep it up that way and make sure you keep in touch with Rubin Wolf directly." Tr. 183. Kraus subsequently sent a letter with a memorandum and schedules to indicate that the management of Bedford Gardens was meeting the quota set by HDA.[16] Kraus testified that Douglas Moritz of the WFHC monitored the rental of Bedford Gardens to make sure that the ratio was being followed. In support of this testimony, the Bedford Gardens defendants submitted a letter written by Moritz to Kraus, dated May 19, 1975, attached to Bedford Gardens defendants' ("BG's") Exh. A. In the letter, Moritz introduced the WFHC as a committee operating "in search of equal opportunities in housing, especially in publicly-funded developments." Moritz referred Kraus to the HDA rules and regulations and requested the opportunity to inspect the Bedford Gardens waiting list. In a letter dated May 30, 1975, Millman, the director of management at the project, referred Moritz to various HDA employees and sought to assure Moritz that Bedford Gardens would be rented in accordance with all HDA rules and regulations. BG's Exh. A. Moritz later wrote Millman about Bedford Gardens' rental, letter dated November 12, 1975, BG's Exh. C, asking, *inter alia*, "what are your expected/anticipated rentals going to be, by ethnicity and family size, at Bedford Gardens, within the '75/20/5' racial policy."

Regarding the maintenance of the ratio at the project, Kraus testified:

We rented vacancies on a first-come, first-serve basis, but plugging in to the

apartment the ethnic family that belonged in that apartment in order not to disturb the ratio for Bedford Gardens. Therefore, if an apartment vacated that was, if you will, a Puerto Rican apartment, we go down the list of our waiting list until we found a qualified Puerto Rican family to go into that apartment. Tr. 190. That policy changed after a meeting with counsel. Since then, Bedford Gardens has been rented according to the Consent Decree.

Finally, Kraus testified at length about the harm he believed that an injunction would do to his business. He stated that an injunction would likely prevent him from getting the approvals and arranging the financing necessary to deal in subsidized housing. He stated that an injunction would likely prevent him from getting the approvals and arranging the financing necessary to deal in subsidized housing. He stated that an injunction is unnecessary because he will continue to adhere to his representations to the Court pending final determination of this action.

*Betty Sargeant*

The Bedford Gardens defendants next called Betty Sargeant as a witness. She worked for the Office of Equal Opportunity at the HDA. She testified that she did not recall discussing the Bedford Gardens ratio with anyone within the HDA on or after March 8, 1973 or discussing after that time the tenanting at Bedford Gardens with her supervisors. She also did not recall meeting with any representative of Kraus Management to discuss the Bedford Gardens ratio or doing anything else regarding Bedford Gardens from 1973 to 1975.

---

**16.** In the letter, Kraus stated to Starr "that we have assiduously followed your and HUD's affirmative marketing plan guidelines." Letter from Herman I. Kraus to Roger Starr, dated Mar. 30, 1976, BG's Exh. H. Kraus enclosed a schedule of ethnic percentages for the various Bedford Gardens buildings and a covering Memorandum from Arthur Millman to Kraus, dated Mar. 30, 1976. In the Memorandum, Millman states in part:

In accordance with your request of Thursday, March 25th with reference to the above caption annexed hereto is a chart containing

for each building at Bedford Gardens the ethnic distribution of apartments rented as of 3/31/76. You will note the numbers reflect the 75, 20, 5 renting guidelines established and approved by HUD and H.D.A. in the Affirmative Fair Marketing Plan.

You may be assured that we will continue to follow the renting guidelines strictly and that we will make every attempt to see that the final rent-up statistics are exactly in accordance with HUD's Affirmative Fair Marketing Plan.

In 1976 Sargeant was given the responsibility to monitor the Bedford Gardens Marketing Plan. As part of that responsibility, she occasionally reviewed applications to get an ethnic breakdown for Bedford Gardens apartments. She did not recall Laila Long, her supervisor two steps above her, asking her whether the breakdowns fell within certain percentages. Sargeant did recall, however, that at some time she had thought in terms of a ratio. That ratio might have come from the Marketing Plan. In response to a question from the Court, she stated that the ratio in the Marketing Plan sets forth goals rather than a ratio. She wrote in terms of goals in a Memorandum to Laila Long, dated March 16, 1976, BG's Exh. Y: "The total number of approved applications reflect the ethnic goals of [Bedford Gardens (75/20/5)]. However, it appears that the rent assistance program apartments and the larger units are not equitably distributed." She indicated that the breakdown as of March 3, 1976 indicated that Whites had 87% of the RAPP subsidy, Blacks 1%, and Hispanics 10%. Whites had 80% of the three-bedroom apartments and 100% of the four-bedroom apartments. *Id.*

Sargeant accepted as accurate her prior deposition testimony to the effect that she had recalled some discussion at some time about basing rental guidelines for Bedford Gardens on the ethnicity ratio for New York City as a whole, which was 70% White/ 30% non-White. She did not recall knowing, however, whether the HDA had an approach to integration in Brooklyn or in New York City in 1973.

Sargeant was cross-examined about Pl.'s Exh. 46, a monitoring report she prepared regarding Bedford Gardens. The report indicates, *inter alia*, that as of June 1, 1976, minority families occupied 90 Bedford Gardens units and majority families occupied 365 units. At that time, Bedford Gardens had on hand applications for 26 minority families and 21 majority families. The visitors to Bedford Gardens were approximately 70% minority and 30% majority. *Id.* ¶ 7(b). This information was given to Sargeant by Derek de Groat, a Bedford Gar-

dens' employee. The monitoring report also indicates, as the Bedford Gardens defendants brought out on redirect examination, that Bedford Gardens appeared to be in compliance with the Marketing Plan. *Id.* ¶ 10.

### Laila Long

The Bedford Gardens defendants next called Laila Long. At the time of the trial, she was the Assistant Commissioner of the Office of Equal Opportunity and Community Affairs of the Office of Housing Preservation and Development. The position was comparable to the one she had held while the agency was the HDA. She was responsible for the implementation of equal opportunity procedures. Regarding publicly assisted housing projects within the agency's jurisdiction, she and her office had the responsibility for "working out" the Affirmative Fair Marketing Housing Agreements and for monitoring the implementation of those agreements. Tr. 445. She recalled working on the implementation plan for Bedford Gardens, but she did not have any role in the formulation of its plan.

In regard to marketing plans, Long and her office would work with community representatives "to determine what would be a realistic and sensible goal in accordance with the existing guidelines" for the particular project. Tr. 446. She testified that she and her office looked at goals for individual housing projects in relation to goals for other projects within an urban renewal area. In the implementation stages, they considered Bedford Gardens' goals in relation to the goals for the WURA generally. She had a vague recollection of goals for the WURA area, but she could not recall what those goals had been. She did recall that the goals for Bedford Gardens were 75/20/5. She first learned of those goals after HUD had approved the Marketing Plan.

Long testified that whenever the goals for Bedford Gardens were discussed, the goals for Clemente Plaza, and sometimes for other projects, were also discussed. The HDA began to move with the agreement of

the community toward a 75/25 ratio for Bedford Gardens and a 25/75 ratio for Clemente Plaza. "[T]here seemed to be general agreement on the part of all the community groups about the affirmative marketing goals during the period toward the tail end of the rent-up at Bedford, and just before rent-up began at Clemente." Tr. 462. No groups objected to Bedford Gardens' goals because the shared concern was the goal for the entire WURA, which was 51% majority/49% minority, and not a particular project's goals. Long was particularly concerned about community agreement because of the possibility of ethnic conflict in the WURA. Long understood federal guidelines to indicate that "the general goal for [the WURA] should be an attempt at the end of renewal to insure that occupancy remained roughly what it was at the time the Government moved into the area." Tr. 470.

For a particular project, she and her office would seek to assure themselves that the project was making a good faith effort to achieve the marketing plan goals. If the rent-up were not proceeding in accordance with the goals, meetings with the sponsor or managing agent would be arranged to ascertain the problem. "If there was an indication of lack of good faith or discrimination, or any of the other approaches which are not permitted [such as a "fixed quota," Tr. 507], then we would stop processing applications until we had resolved the situation." Tr. 472.

Long testified that in achieving goals individual priorities must be recognized. An applicant with one priority could be passed over for an applicant with a lower priority if there was another development in the urban renewal area where the higher priority could be exercised. To be passed over, the applicant with the higher priority would have to be given a choice and to agree to being passed over. Long's department would review priorities only if a problem

came to their attention. She did not recall Bedford Gardens applications being referred to her for review regarding priorities.

*Douglas John Moritz*

The Bedford Gardens defendants called Douglas Moritz as their final witness. From February 1974 to May 1976, Moritz was a consultant to the Williamsburg Housing Association. During that period, he was also the secretary of the WFHC. He testified that the purpose of the WFHC was "to seek fair and integrated rental policies in the publicly assisted housing that was occupied and being developed in the Williamsburg area." Tr. 521. The WFHC informed people in the community of the opportunities for housing.

In the spring of 1975, he became aware of the ethnic goals for Bedford Gardens. Laila Long of the HDA showed the WFHC a copy of the Marketing Plan for Bedford Gardens. Sometime during the previous year, Moritz had had discussions regarding goals for Clemente Plaza. The Williamsburg Housing Association, the group sponsoring Clemente Plaza, sought a rental policy that would return the neighborhood to the residential profile it had at the time of Clemente Plaza's title vesting. It used figures from the HDA: 50% White, 50% non-White. That policy and the 50/50 ratio are also reflected in Intervenor Exh. 2, Letter from Rev. Bryan J. Karvelis, Chairman of the Board of the Williamsburg Housing Association, to Laila Long, Deputy Administrator of the HDA Office of Equal Opportunity, dated May 29, 1975, which Moritz assisted in preparing. In pursuing the policy of achieving the ethnicity of the neighborhood at the time of title-vesting, the Williamsburg Housing Association would consider rental policies at other projects, including the 75/20/5 ratio at Bedford Gardens, in renting Clemente Plaza. *Id.* Long of the HDA approved of this policy, as did the WFHC.[17]

---

17. In letters to Congressman Fred Richmond, Moritz related the rental ratio at Bedford Gardens to that for Clemente Plaza. On July 29, 1975, Moritz asked Congressman Richmond to speak at a rally

as emergency response to attempts by the Hasidic community of Williamsburg to pres-

Although Moritz was aware of the 75/20/5 rental ratio at Bedford Gardens, he did not approve of it. When asked whether he ever indicated approval of it, he replied, "Not if I was going to remain working in Williamsburg." Tr. 536. He testified that he indicated disapproval of that ratio to anyone who would listen, including Long of the HDA and Millman at Bedford Gardens. "[I]ntegration was our whole issue, and the point here is simply that as close as possible we were seeking all developments to reflect [the 50/50] profile." Tr. 539.

After learning of the ethnic ratio at Bedford Gardens, Moritz, on behalf of the WFHC, tried to keep abreast of rental progress at Bedford Gardens by inquiring of Kraus Enterprises, the NYCHA, and the HDA. Kraus Management referred Moritz to the HDA regarding further inquiries. Letter from Arthur Millman to Doug Moritz, dated Nov. 28, 1975, BG's Exh. AN. After receipt of that letter, Moritz directed his inquiries to the HDA.

> sure the HDA and the Mayor's Office to permit a rental policy at Clemente Plaza of predominately white families. This in spite of an already approved 75% white tenancy plan for Bedford Gardens, the other Mitchell-Lama in the Williamsburg Urban Renewal Site. Original agreements, though only verbal, were that Bedford Gardens would carry 75% white tenancy and that a reciprocal 75% Hispanic and Black tenanting would be at Clemente Plaza.

Letter from Douglas Moritz to Congressman Fred Richmond, dated July 29, 1975, BG's Exh. AL. In a subsequent letter, Moritz wrote:

> The "75/25" reciprocal agreement[s] for each site remaining at the Urban Renewal Project . . . were agreed to by informal agreement, and the Hispanic and Black community in Williamsburg needs assurances that such a balance that would be created by such a rental policy would be honored at the Urban Renewal Site. We are asking that all those who accept this rental agreement as a just settlement to a dispute that has existed for quite some time express that same opinion to the Mayor and his administrators.

Letter from Douglas Moritz to Congressman Fred Richmond, dated August 5, 1975, BG's Exh. AM.

18. On cross-examination, plaintiffs introduced a letter from Moritz to Millman complaining about lack of cooperation.

> To date, your contact with [the WFHC], or the community represented by this organiza-

During the summer of 1975, the WFHC made protests in connection with the rental at Clemente Plaza. Moritz wrote Roger Starr, HDA Administrator:

> We have become aware of recent attempts to again try to alter the apartment distributions at Roberto Clemente Plaza in such a way as to imbalance the ethnic breakdown of the Williamsburg Urban Renewal Site. Such imbalance is again prejudicial to the Hispanic and Black community of Williamsburg and totally unacceptable by this Committee, its members and those it represents. Such alterations, if realized, can only create tragic consequences for all concerned. Any decline in the opportunity for fair housing across the Urban Renewal Site will not be tolerated.

Letter from Douglas Moritz to Roger Starr, dated Jan. 28, 1976, BG's Exh. AH. It was before January 28, 1976, however, that Moritz protested to Millman about the Bedford Gardens' rental ratio.[18]

> tion has existed only in so far as you have answered any letters we have sent. This organization and the community it represents has not been notified as to when and how applications could be obtained for Bedford Gardens. Advertisements have not appeared in newspapers and periodicals that might reach this community. And yet, you have opened a renting office, relying on "word of mouth" for the community-at-large to be notified. Your rental campaign has to date been conducted without a tri-lingual approach, which also limits contact with this community. Important information on rentals is being distributed in English to people who have difficulty in reading it, because of language and content.
>
> This approach, clandestine in nature, cannot be considered "cooperation." We look forward to better relations.

Letter from Douglas Moritz to Arthur Millman dated Aug. 27, 1975, Pl.'s Exh. 64.

Moritz prepared other letters complaining about rental practices at Bedford Gardens. Moritz wrote Long of the HDA that Kraus Management has been

> trying in every way to discourage people from pursuing [Bedford Gardens] housing. Mr. Zelcer, at the site renting office, has continually told Black and Hispanic applicants, and in a number of instances Former Site Occupants (more than *once*), that their incomes must be at Section 236 levels and that no other income level would be con-

*Miriam Kerpen*

New York City called Miriam Kerpen. In January 1974 Kerpen was an HDA employee. She headed a "subsidy liaison unit" that "assembled" administrative clearances that HUD required to process section 236 projects. At that time the job required sending to the project sponsor a list of the administrative requirements for a section 236 contract. One of those requirements was an affirmative fair housing marketing plan. The marketing plan was a HUD form on which the HDA had prepared boilerplate. The HDA also helped the sponsor by giving it statistics regarding the area in which the project fell.

Bedford Gardens was one of those projects. Kerpen knew Kraus from work relating to other projects, but she could not recall a specific meeting with him in regard to Bedford Gardens. She did not recall ever discussing with him ethnic goals for Bedford Gardens. It was not her job to discuss rental policies with the sponsor. In fact, Kerpen did not recall any conversation with Kraus regarding the Marketing Plan, as proposed, HUD Exh. 3. She also did not recall discussing "tipping" with Kraus in relation to Bedford Gardens or Clemente Plaza. She testified that "tipping" was not part of her language.

On cross-examination by HUD, Kerpen testified that she might have suggested the 75/20/5 percentage figures to Kraus or someone on his staff. Her office suggested the figures to many sponsors; they were a goal acceptable to HUD. She had no specific recollection, however, of suggesting the percentages to Kraus. She testified that the extent of her work regarding Bedford Gardens' Marketing Plan was to mail the sponsor the format. She would, as a matter of practice, provide more assistance

to a developer not considered sophisticated, but she considered Kraus "one of our most sophisticated developers." Tr. 587. On cross-examination by plaintiffs, she testified that she never advised sponsors to meet the special outreach goals given on the marketing plan by designating apartments with a racial quota.

*Rubin Wolf*

New York City called Rubin Wolf. Rubin Wolf was the HDA project director in the WURA. His responsibility was to make sure that site and former site occupants could exercise their rights to apply for rental in projects, the construction of which had caused their relocation. He had no responsibility for the enforcement of equal opportunity policies.

Wolf recalled a meeting regarding Bedford Gardens that took place in the spring of 1975 at the HDA Hooper Street field office. Various community people had requested a meeting with Kraus to learn when the construction of Bedford Gardens would be completed and what the rent-up procedures would be. At that meeting there was no discussion regarding the project's ethnic composition.

Wolf subsequently had meetings at Bedford Gardens with Kraus or his representatives. At one such meeting, Millman showed Wolf a chart of prospective occupancy. The chart was cardboard, mounted on a blackboard, and it displayed the Bedford Gardens building layout with apartment numbers and different colors. The colors represented different ethnic groups. Millman did not inquire whether New York City approved the use of such a chart in rental, and Wolf did not indicate his approval of the chart. Wolf did not recall whether he reported the chart to his superiors.

---

sidered, completely disregarding the Section 212 and Leased Housing Programs at Bedford Gardens.

Letter from the WFHC to Laila Long, Jan. 30, 1976, Pl.'s Exh. 65. In another letter, Moritz complained about efforts to discourage a particular family, one with former-site-occupant priority. Letter from the WFHC to Abraham Zelcer, Kraus Management, dated Jan. 30, 1976, Pl.'s Exh. 66. In letters to the HDA and

to the NYCHA, Moritz complained about "irregularities" in Bedford Gardens' rental practices. Moritz stated that non-White families were being routed away from Bedford Gardens to other projects. Letter from Douglas Moritz to Laila Long, dated Mar. 1, 1976, Pl.'s Exh. 67a; Letter from Douglas Moritz to Joseph Christian, NYCHA Chairman, dated Mar. 3, 1976, Pl.'s Exh. 67b.

The UJO had requested a meeting with Kraus regarding rent-up at Bedford Gardens. Kraus said that he would meet with the UJO only if he was ordered to do so by an HDA official. Around the middle of July 1975, Wolf met with Administrator Starr.[19] He did not recall a meeting in Starr's office that Kraus and Bergen attended.

## ARGUMENTS

*Plaintiffs ·*

Plaintiffs argue first that Kraus's ethnic-racial quota constitutes intentional discrimination on the basis of race and national origin and thereby violates the equal protection clause and federal civil rights acts. The Bedford Gardens defendants' practices are explicit and intentional classifications based on race and national origin. Accordingly, recent cases requiring a showing of discriminatory intent where racially neutral actions have a disproportionate effect on non-Whites are inapplicable. And because the Bedford Gardens defendants, and the NYCHA at Kraus's behest, applied classifications based on race and national origin, the classifications are subject to strict scrutiny: they may be justified only where they serve compelling state interests. The evidence fails to establish that the classifications served any proper state interests, let alone compelling ones.

Plaintiffs contend that because the defendants used classifications based on race and national origins, *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir. 1973), governs the statutory and constitutional claims made here. The *Otero* justification for racial and ethnic classifications—to preserve integration within an area—is not met in this case. Only on the day before the trial did the Bedford Gardens defendants, relying on *Otero*, suggest that the ratio was necessary to prevent "tipping" or, specifically in this case, the departure of White families. This suggestion, plaintiffs argue, is inapposite here: the government bodies have not raised the

argument; there is no evidence that tipping was a concern in the WURA; and the analysis necessary to support a governmental attack on tipping was never undertaken here. Other suggested justifications for the quota, such as preventing violence, are legally or factually insufficient.

Plaintiffs argue secondly that the Bedford Gardens defendants did not establish a defense to racial and national origin discrimination. Specifically, they contend that HDA's alleged participation in the ratio is not a defense. The record does not establish that Kraus only followed HDA's orders. Even if he did, the Bedford Gardens defendants would still be liable because they owed plaintiffs a duty independent of HDA's duty. Furthermore, the Bedford Gardens defendants' discrimination would not have been rendered lawful by governmental approval.

Plaintiffs also argue that the WFHC's alleged participation in the use of the ratio was not proven. Even if it had been, they contend, such participation would not be a defense. The defendants have not shown evidence that would justify application of the "clean hands" doctrine to the WFHC or to the other plaintiffs: there is no evidence here that the plaintiffs are guilty of intentional misconduct amounting to fraud. Even if Moritz, representative of the WFHC, did encourage the defendants to rent at the 75/20/5 ratio, the Court ought not invoke the doctrine. Moritz did not affect the Bedford Gardens defendants' policies: the quota was established and implemented prior to their contact with Moritz. Moreover, the quota violates the public policies embodied in the Constitution and the civil rights statutes involved here. In any event, the clean hands doctrine would not affect plaintiffs other than the WFHC.

Thirdly, plaintiffs argue that complete injunctive and declaratory relief is necessary here. They contend that the most appropriate form of injunctive relief is the Consent Decree. The Court's goals, they

---

**19.** This meeting appears to have resulted in the Letter from Roger Starr, HDA Administrator, to Herman Kraus, dated July 30, 1975, BG's Exh. E. Part of the text of that letter is set out at n. 13 *supra*.

contend, should be to insure that no future housing violations occur and to remove the present effects of past discrimination. The present effects include the non-Whites' inadequate share of Bedford Gardens apartments and the indignity suffered because of the Bedford Gardens defendants' intentional discrimination.

The plaintiffs argue that injunctive relief is necessary not only to remedy present effects of past discrimination, but also to insure that the discrimination does not recur. The defendants' expressions of intent to halt use of the quota are questionable: they stopped using the quota only on the advice of counsel and after litigation had commenced; their voluntary compliance with their version of the Consent Decree extends only to the end of litigation; and they continue to assert the legality of the quota. Furthermore, the continuing nature of the violations justifies injunctive relief: the violations, which have been neither isolated nor merely technical, have stigmatized non-Whites and excluded them from housing they needed.

Finally, the plaintiffs argue that requiring the Bedford Gardens defendants to abide the Consent Decree is particularly appropriate because (1) the extensive constitutional violations in this case make it necessary; (2) the Consent Decree provides an interim step toward barring the use of racial and national origin qualifications; (3) it is tailored to fit these particular violations; and (4) it was devised through cooperation among all segments of the affected community.

*Bedford Gardens Defendants*

In their post-trial memorandum, the Bedford Gardens defendants contend that the evidence establishes that the HDA gave them a predetermined and approved plan for integration in the WURA. According to their reading of the evidence, the HDA prepared a plan to integrate the entire WURA based on information unavailable to the Bedford Gardens defendants. The WURA community groups, including the WFHC, approved this integration plan, and plaintiffs offered no evidence that this overall approach was improper. In developing this plan, the HDA considered several factors, including the exodus of Whites from the area and the tension between the Hispanics and the Hasidics. The HDA goals given to the Bedford Gardens defendants were an attempt to reach out to departing Whites to prevent the "ghettoization" of the area. The Bedford Gardens defendants had no independent source of information as to the proper ethnic goals for Bedford Gardens. Their only information was that given them by the HDA. They properly deferred to that agency's expertise. Moreover, the defendants lacked the ability to change the overall plan of integration for the area. Only the HDA could affect other projects and rearrange the ethnic distribution of the area. They heeded the HDA's warning that deviation from their role in the assigned plan might lead to racial violence. They contend that the evidence also establishes that HUD approved the HDA's ratio plan for Bedford Gardens and that the Bedford Gardens defendants were told only of this approval. They also contend that the WFHC accepted, monitored, and insisted on the Bedford Gardens defendants' adherence to their assigned ratio.

The Bedford Gardens defendants argue secondly that they properly implemented the HDA's integration plan. The plaintiffs presented no evidence whatsoever that any person was denied an apartment because of his or her race. The plaintiffs try to infer a denial on a racial basis from the defendants' application of eligibility requirements that, while proper, reasonable, and racially blind, may have had the effect of disqualifying more minorities than Whites. Specifically, the four criteria of priorities, income level, family size, and acceptable housekeeping all are proper factors in renting a housing development. A failure to apply the first—priorities—would not discriminate against any race, but would apply equally to all priority holders. In any event, priorities apply to urban renewal areas as a whole, not rigidly to a single project; they may be subordinated to proper ethnic goals; and the application of priorities would not have altered the racial composition of Bedford Gardens. In this case, the HDA assumed

the responsibility for recognizing any priorities; any failure to do so was the HDA's, not the Bedford Gardens defendants'. In fact, the HDA supervised the entire rental process at Bedford Gardens. The HDA never found that the Bedford Gardens defendants had failed to meet their responsibilities in any way.

The Bedford Gardens defendants argue that, though they properly implemented the HDA integration plan, they never found it necessary to impose a quota to achieve the HDA ratio. They may have believed that they were required to apply such a quota if necessary to reach the 75/20/5 goals. The data shows merely that the Bedford Gardens staff used their best efforts to achieve "goals," not a ratio. The NYCHA's rental efforts came closer to the ratio than did these defendants. Charts that plaintiffs had introduced as evidence of a quota were in fact not used in the rental process.

Thirdly, they argue that they are not liable even if a quota was used at Bedford Gardens. They were required by law to carry out the instructions of the HDA. In carrying out those instructions, they intended to promote integration in the WURA. The HDA and community groups made in clear to the Bedford Gardens defendants that any deviation from the HDA plan in favor of one group would be regarded as improper and discriminatory. Everyone accepted the plan. The WFHC, UJO, and HDA all monitored the rental process. None complained of the ratio. The plaintiffs complained about Bedford Gardens only as a retaliatory afterthought in response to UJO intervention and complaints against rental at Clemente Plaza. The Hispanics believed that they did not get their share of the rental at Clemente Plaza, which explains their late complaint. Plaintiffs have failed to establish not a discriminatory effect, but also discriminatory intent.

Finally, the Bedford Gardens defendants make several arguments against the Court's enjoining them. They contend first that plaintiffs have introduced no proof of the likelihood of future violations. They assert that they have never deviated from their representations to rent according to the Consent Decree. It would be against their business interests not to carry out their representations: a failure to keep their word would impair, if not devastate, their business. They also argue that no one will be injured in the absence of an injunction. They will rent at whatever ratio the Court suggests. Enjoining them will hurt only them; the balance of hardships tips decidedly in their favor. Their evidence that an injunction would seriously impair their business stands unrebutted. Finally, the Bedford Gardens defendants welcome a declaration by the Court of proper goals and procedures for the rental of Bedford Gardens, though they maintain that not even declaratory relief is necessary.

*HUD*

HUD argues first that the Bedford Gardens had no lawful justification for the use of an ethnic/racial quota at Bedford Gardens. A developer may not unilaterally use such a quota to avoid tipping. Neither HUD nor the HDA is claiming that a defense of tipping is appropriate. HUD's only involvement is through the receipt and approval of the Marketing Plan. The Marketing Plan does not authorize a developer to use race as a quota. The record also does not support the allegation that the HDA approved the use of a quota at Bedford Gardens. Finally, equitable relief, at a minimum consistent with the Consent Decree provisions, should be imposed against the Bedford Gardens defendants.

## DISCUSSION

Section 3604 of Title VIII makes it unlawful

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, or national origin.

.　　　.　　　.　　　.　　　.

(d) To represent to any person because of race, color, religion, sex, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.[20]

**20.** Section 3612 of Title VIII provides:

(a) The rights granted by sections 3603, 3604, 3605, and 3606 of this title may be enforced by civil actions in appropriate United States district courts without regard to the amount in controversy and in appropriate State or local courts of general jurisdiction.

. . .

. . . .

(c) The court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order, and may award to the plaintiff actual damages and not more than $1,000 punitive damages, together with court costs and reasonable attorney fees in the case of a prevailing plaintiff: *Provided,* That the said plaintiff in the opinion of the court is not financially able to assume said attorney's fees.

**21.** Section 2000d provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

Title VI proscribes only those racial classifications prohibited by the equal protection clause or the fifth amendment. *Regents of the University of California v. Bakke,* 438 U.S. 265, 287, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). See discussion in text regarding the requirement of intent under the equal protection clause and the presence of intent in this case.

**22.** Section 1981 provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Section 1982 provides:

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

Sections 1981 and 1982 provide independent and alternative bases of liability in addition to those given above. *Jones v. Alfred H. Mayer*

(Footnote added). Plaintiffs also sue under Title VI, 42 U.S.C. § 2000d,[21] 42 U.S.C. §§ 1981 & 1982,[22] *id.* § 1983 and the equal protection clause of the fourteenth amendment,[23] and agency rules and regulations.[24]

*Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

**23.** Section 1983 and the equal protection clause prohibit discriminatory *state* action. *E. g., Flagg Bros. v. Brooks,* 436 U.S. 149, 155–56, 98 S.Ct. 1729, 1733, 56 L.Ed.2d 185 (1978) (section 1983); *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 349, 95 S.Ct. 449, 452, 42 L.Ed.2d 477 (1974) (14th amendment). Although there has been considerable testimony in this action regarding the roles of various agencies, the evidence does not support a finding of state involvement in the particular violations found in this Opinion and Order. *See generally Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 351, 95 S.Ct. at 453 ("[T]he inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself."); *see also, e. g., Girard v. 94th Street & Fifth Avenue Corp.,* 530 F.2d 66, 69–70 (2d Cir. 1976), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976); *Coleman v. Wagner College,* 429 F.2d 1120 (2d Cir. 1970). Accordingly, the Court will not further address the claims asserted under section 1983 and the equal protection clause of the 14th amendment.

**24.** HUD regulations, 24 C.F.R. § 1.4 (1975), provide:

(a) *General.* No person in the United States shall, on the ground of race, color or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity to which this Part 1 applies.

(b) *Specific discriminatory actions prohibited.* (1) A recipient under any program or activity to which this Part 1 applies may not, directly or through contractual or other arrangements, on the ground of race, color, or national origin:

(i) Deny a person any housing, accommodations, facilities, services, financial aid, or other benefits provided under the program or activity;

(ii) Provide any housing, accommodations, facilities, services, financial aid, or other benefits to a person which are different, or are provided in a different manner, from those provided to others under the program or activity;

(iii) Subject a person to segregation or separate treatment in any matter related to his receipt of housing, accommodations, facili-

■ To prove a prima facie case of national origin or racial discrimination under Title VIII, plaintiffs need only demonstrate that the challenged actions had a discriminatory effect; they need not demonstrate discriminatory intent. *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1036 (2d Cir. 1979) (and cases cited therein). The plaintiffs' burden is lighter, therefore, than under the equal protection clause, which requires a showing of discriminatory intent as well as discriminatory effect. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 268–71, 97 S.Ct. 555, 565–566, 50 L.Ed.2d 450 (1977). The case at bar, however, does not involve a facially neutral refusal to rezone land, as in *Arlington Heights*, or a refusal to sell a cooperative apartment, as in *Robinson*. Rather, it involves an explicit quota and explicit distinctions drawn on lines of race and national origin. Accordingly, evidence of discriminatory motive accompanies evidence of discriminatory effect; both, in this case, constitute plaintiffs' prima facie case.

*Prima Facie Case*

■ To establish their prima facie case of discrimination on the bases of race and national origin, plaintiffs rely primarily on the testimony of Arthur Millman. Millman was director of management for Kraus Management from early spring 1975 to spring 1977 and was in charge of Bedford Gardens rent-up. Tr. 7–8. Kraus, with whom Millman consulted on a daily basis, Tr. 9, instructed Millman to rent Bedford Gardens 75% to Whites, 20% to Hispanics, and 5% to Blacks. Tr. 9–10.

Kraus instructed Millman to apply this quota by apartment size, floor, building, and subsidy. Tr. 10–12, 18–20, 270–71, 288. Pl.'s Exhs. 37 & 38, prepared by someone on Kraus Enterprises' development staff, Tr. 12, show a planned breakdown of ethnicity according to the 75/20/5 quota by apartment size. The exhibits were prepared before the Bedford Gardens defendants began accepting preliminary applications for apartments at Bedford Gardens. Tr. 14–16. Millman communicated Kraus's instructions to the staff. Millman and his staff used their best efforts to rent apartments according to the quota, and they substantially achieved that goal. Tr. 20. The Bedford Gardens staff monitored itself to make sure that the quota was being met and assured the HDA that it was being met. Tr. 289; *see* n. 16 *supra*. The Bedford Gardens defendants also established ethnic designations for the apartments leased by the NYCHA. *See* n. 10 *supra*.

The Bedford Gardens staff maintained the quota by maintaining, for the most part, the racial designations given to the apartments. When a White family vacated a White-designated apartment, the staff went down the list of eligible applicants to the next White family, and they did the same with the other racial designations. *See* Tr. 64–66. Although the staff may not have followed this practice uniformly, they did pursue their main purpose—to maintain the quota. *Id.* & Tr. 99, 280–81. The staff

---

ties, services, financial aid, or other benefits under the program or activity;

(iv) Restrict a person in any way in access to such housing, accommodations, facilities, services, financial aid, or other benefits, or in the enjoyment of any advantage or privilege enjoyed by others in connection with such housing, accommodations, facilities, services, financial aid, or other benefits under the program or activity;

(v) Treat a person differently from others in determining whether he satisfies any occupancy, admission, enrollment, eligibility, membership, or other requirement or condition which persons must meet in order to be provided any housing, accommodations, facilities, services, financial aid, or other benefits provided under the program or activity.

*Id.* § 200.610 provides:

It is the policy of the Department to administer its FHA housing programs affirmatively, so as to achieve a condition in which individuals of similar income levels in the same housing market area have a like range of housing choices available to them regardless of their race, color, religion, or national origin. Each applicant for participation in FHA subsidized and unsubsidized housing programs shall pursue affirmative fair housing marketing policies in soliciting buyers and tenants, in determining their eligibility, and in concluding sales and rental transactions. HDA priority requirements are set out at n. 11 *supra*.

continued to rent according to the quota at least through April 1977. Tr. 63.

In short, plaintiffs provide compelling evidence that the Bedford Gardens defendants applied a quota based on race and national origin throughout Bedford Gardens—by building, floor, apartment size, and subsidy. They did not stop, however, at drawing distinctions based on race and national origin. They also extended Whites special treatment. For one, they allowed the UJO to designate 81 families for the more favorable RAPP subsidy apartments.[25] Tr. 31–34 & n. 12 *supra*. For another, Whites were given more favorable treatment regarding four-bedroom apartments. Of a total of 48 such apartments, Whites were assigned to 45. Of the 34 apartments not assigned to the NYCHA section 23 leasing program, all 34 were rented to Whites. Tr. 23–29, 84–88, 290–92; BG's Exh. Y (see Sargeant testimony *supra*). There is no evidence of the Bedford Gardens defendants' giving similar treatment to any other group. All of the 81 families recommended by the UJO were White. Tr. 34.

The Bedford Gardens defendants also gave special treatment to Whites by making a more extensive "outreach" effort toward them. Kraus Management consulted with the UJO throughout the rental process; it did not make a comparable effort on behalf of non-Whites. The advertising aimed at Whites was more extensive than that aimed at non-Whites. Tr. 44–47. The Bedford Gardens defendants also gave Whites a greater involvement in the Bedford Gardens rent-up by allowing the UJO to oversee the rent-up from a desk in the rental office.

Millman was unaware of any studies of "pools" as bases for use of the 75/20/5 quota. Tr. 41–43. Kraus knew that the quota did not correspond to the population characteristics of the area. In the application to HUD for a section 236 subsidy he stated:

Based upon the population characteristics in the Community Planning District No. 1, the percentage of Whites has declined from 71.6% in 1960 to about 55% in 1969,

while the percentage of Blacks and Puerto Ricans has increased from 28.4% in 1960 to 45% in 1969.

HUD Exh. 4, dated Jan. 31, 1974 and signed by Herman Kraus, at 3, ¶ 1. Bedford Gardens' list of applicants eligible for the section 236 subsidy, Pl.'s Exh. 45; Tr. 48–51; 73–78, which indicates ethnicity of each applicant, indicates that at least 62% of the eligible applicants were non-White. According to information given by a Bedford Gardens employee to an HDA employee, 70% of the visitors to the Bedford Gardens site were non-White. Pl.'s Exh. 46; *see* Sargeant testimony *supra*. Although an especially high percentage of non-Whites may conceivably have not become Bedford Gardens' tenants for legitimate reasons, as argued by the Bedford Gardens defendants, the high percentages of non-Whites in the above categories suggest a discriminatory effect, especially in the context of the explicit, pervasively applied quota discussed above. At minimum, these figures would have put the Bedford Gardens defendants on further notice that the 75/20/5 ratio did not correspond to any applicant pools, to the disadvantage of non-Whites.

The Bedford Gardens defendants were obligated under Bedford Gardens' Land Disposition Agreement and HDA regulations, see n. 11 *supra*, to give priorities to those applicants having them—and in a mandated order. Millman thought that HDA had taken care of the priorities, but he did not recall anyone at Bedford Gardens exercising independent judgment to determine whether the regulations governing priorities were being followed. Tr. 56–63, 95–96. Had the priority rights of applicants been observed by the Bedford Gardens staff, Millman, as director of management, would have known of it. See Tr. 62–63. Further evidence of the staff's inattention to priorities may be found in the practice of designating apartments with a particular ethnicity. Finding a family with the proper ethnicity to fill a vacant apartment, rather than taking the family with the next priority, would logically have in-

---

**25.** See n. 2 *supra* for a discussion of the public subsidy programs in effect at Bedford Gardens.

volved ignoring priorities. Allowing the UJO to designate families for 81 RAPP apartments would also have resulted in ignoring priorities.

The Bedford Gardens defendants' failure to observe applicants' priorities may not have been a race-conscious decision. The effect would be discriminatory, however, where—for example—priorities were ignored because 81 RAPP apartments were turned over to the UJO or where a White family was given an apartment instead of a non-White family with a higher priority because the apartment was designated White.

Plaintiffs also argue that the Bedford Gardens defendants frustrated priority right holders by rejecting applicants because they did not meet the income-eligibility standards for the section 236 subsidy and then failing to review those applicants again after Bedford Gardens had received approval for the deeper subsidies under sections 23 and 212. Plaintiffs state that "[o]nly ten out of the first 266 families with priority rights were found eligible for § 236 apartments; only three of those (1%) were Spanish-surnamed; seven (3%) were not (see [Pl.'s Exh. 60, Bedford Gardens Preliminary Applications; Pl.'s Exh. 69, U.S. Dep't of Labor, Supplement to Manual of Immigration Spanish])." Plaintiffs' Memorandum at 12 n. *. The Bedford Gardens defendants respond, inter alia, that priorities were to be applied to an urban renewal area as a whole, not applied rigidly to a single project. Memorandum at 19; see Tr. 487 (testimony of Long). The evidence indicates, however, that the priorities were not applied at all, either to the project or to the urban renewal area generally. Nevertheless, the Court does not view the evidence as establishing that the failure to reconsider, under the deeper subsidies, the applicants rejected under the section 236 subsidy as having had a racially discriminatory effect.

In partial summary, the Court concludes that plaintiffs have demonstrated a prima facie case of racial discrimination under Title VIII in the following respects. The Bedford Gardens defendants established a rigid 75/20/5 quota for Bedford Gardens.

They intended to apply and did apply it by apartment size, floor, building, and public subsidy program. Where they deviated from the quota or otherwise cooperated more fully with one group, they did so in favor of Whites: they gave Whites a higher percentage of four-bedroom apartments; they allowed the UJO to designate the families for 81 RAPP apartments; they met with the UJO to reach rental agreements and allowed it to monitor the Bedford Gardens rent-up from a desk at the rental office; and they advertised more heavily in the White press. Finally, they ignored applicants' priorities, which had a discriminatory effect at least in cases where RAPP apartments could be designed by the UJO.

*Rebuttal, Justifications, Defenses*

■ The Bedford Gardens defendants' main witness was Herman Kraus, president of Kraus Management and sole shareholder and president of the Ross-Rodney Housing Corporation. Tr. 145–46. The Court notes at the outset that his testimony supports the conclusion reached above: that a quota was applied, e. g., Tr. 182, 254–55, 264–65; that vacancies were filled according to the ethnicity assigned to the apartment, Tr. 190; that Bedford Gardens succeeded in meeting the quota, Tr. 182; that a UJO monitoring desk was set up at the Bedford Gardens' rental office and that the UJO representative was given, along with the HDA representative, an "approval" stamp, Tr. 351; and that the UJO was allowed to designate families for 81 of the 96 RAPP apartments, Tr. 178.

Notwithstanding the above, the Bedford Gardens defendants contend that no quota was ever applied. They rely in part on the fact that the rental statistics and the quota are not a perfect match. The argument is without merit. That they do not apply the quota more consistently is no defense. They also argue that they merely applied their best efforts to reach a goal, not a quota. But the testimonial evidence, particularly, overwhelmingly supports the conclusion that they applied a rigid quota.

They also argue that there was no discrimination because no one was ever denied

an apartment. Millman testified on cross-examination that he knew of no instance where a White or non-White was denied an apartment for which he was eligible because of the attempts to meet the 75/20/5 ratio. Tr. 83. Millman's statement is not logically credible, given his extensive testimony regarding the successful imposition of a quota. The statement makes greater sense if understood to mean that no person was permanently denied an apartment, or rejected outright, because of the quota. When the staff filled a vacancy in a White-designated apartment by going down the list to find the next White family, they would be denying the apartment to the non-White families passed over. Such a non-White family would, at least for a time, have been denied an apartment for which it was eligible. Stated differently, that family would have been discriminated against in the privileges of a rental. Title VIII requires *no more* to establish a violation. 42 U.S.C. § 3604(b) (*quoted supra*). An applicant need not actually be "denied" a rental. In *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978), for example, the court stated:

> Steering blacks to a particular group of apartments in a complex effectively denies access to equal housing opportunities. . . . The Fair Housing Act prohibits not only direct discrimination but practices with racially discouraging effects; steering evidences an intent to influence the choice of the renter on an impermissible racial basis. . . . The [plaintiffs] need only establish that race was a consideration and played some role in the real estate transaction.

In the case at bar, much of the discrimination rests on the less favorable treatment given non-Whites. *See* discussion *supra*. The Court may also infer that non-Whites were discouraged from ever applying for Bedford Gardens' apartments because of the quota or never learned of housing opportunities at Bedford Gardens because of the minimal advertising and other "outreach" effort directed at them. A finding of discrimination by the Bedford Gardens defendants need not rest on such an inference, however, because the direct evidence of discrimination needs no bolstering.

The Bedford Gardens defendants appear to put more weight into their arguments that, in implementing the 75/20/5 ratio, they were following a plan prepared and approved by the HDA. The HDA allegedly prepared a plan based on the entire WURA to promote integration and to prevent the long-term decline in the White population. The Bedford Gardens defendants purportedly deferred to the HDA because it was required to do so, because they lacked independent knowledge as to proper ethnic goals for Bedford Gardens, and because they lacked the ability to change the plan of integration for the entire WURA.

The evidence does not support this contention. The Court finds that the HDA did not instruct the Bedford Gardens defendants to rent pursuant to a quota. The evidence also does not support a finding that the HDA had any overall plan of integration or that they otherwise acted, or directed the Bedford Gardens defendants to act, to prevent a tipping of the WURA toward a larger non-White population.

To support their contention, the Bedford Gardens defendants rely on Kraus's testimony. He testified that Kerpen of the HDA told him that the 75/20/5 ratio constituted the required rental statistics for Bedford Gardens. Tr. 150–51. Kerpen could not even recall meeting with Kraus in regard to Bedford Gardens. Tr. 581. Nor did she remember discussing the Marketing Plan goals for the project. *Id.* & 583. She further testified that "tipping" was "not part of her language." Tr. 584.

Millman's testimony also runs counter to Kraus's as to the origin of the quota. Millman testified that the initiative for the ratio was Kraus's. Tr. 35–36, 279–80. Millman was the director of management; he was in charge of the rent-up at Bedford Gardens. Given that responsibility and given his extensive contacts with the HDA, it is unlikely that the HDA could have required the implementation of a quota at Bedford Gardens without Millman's knowing the source of that instruction.

The Court could conceivably infer, on this record, that the HDA was the source of the ratio. Kraus's testimony of course would support such an inference. Kerpen testified that she might have suggested the 75/20/5 figure to Kraus or someone on his staff. Her office suggested these figures, a goal that she said was acceptable to HUD, to many sponsors. She did not recall suggesting them to Kraus, however. Tr. 585. Betty Sargeant, who worked for the Office of Equal Opportunity at HDA, did not recall discussing a ratio with anyone at Bedford Gardens from 1973 to 1975, see Tr. 390, 395, 427, but she did testify that at some point she thought in terms of a ratio. Tr. 404. Her involvement with Bedford Gardens was in 1976, however. Tr. 378. Laila Long, the Assistant Commissioner of the HDA Office of Equal Opportunity, did not have any role in the formulation of the Bedford Gardens Marketing Plan, Tr. 446, but she and her office worked with community representatives to determine reasonable goals for projects. *Id.* Her office considered goals for projects in relation to the entire WURA. Tr. 447, 474.

Even if the Court assumed on the basis of this or any other evidence in the record that the HDA was the source of the Bedford Gardens ratio, the record could not support a conclusion that the HDA instructed the Bedford Gardens defendants to apply the ratio as a quota. The Marketing Plan, HUD Exh. 4, ¶ 2, does not speak in any terms resembling a quota: "State what results applicant reasonably expects in terms of occupancy from special outreach efforts[.]" Sargeant testified that the Plan speaks of goals rather than a ratio. Tr. 404; BG's Exh. Y. Long's testimony is the same, Tr. 446–47, 460–62, 471–74, as is Kerpen's, Tr. 585, 594. Even in the letter on which Kraus relied before he would work with the UJO, Roger Starr indicated that priorities would have to be exhausted before the Bedford Gardens defendants could turn to the UJO for suggestions of other families for apartments. Letter from Roger Starr, HDA Administrator, to Herman Kraus, dated July 30, 1975, BG's Exh. E, quoted in part at n. 13 *supra.* The Bedford Gardens defendants, however, did not apply the ratio as a goal to be sought by reason of special "outreach" efforts. Rather, they applied the ratio as a rigid quota. *See* discussion *supra.*

In *Otero v. New York City Housing Authority,* 484 F.2d 1122, 1140 (2d Cir. 1973), the Court of Appeals for the Second Circuit held that the NYCHA "may limit the number of apartments to be made available to persons of white or non-white races, including minority groups, where it can show that such action is essential to promote a racially balanced community and to avoid concentrated racial pockets that will result in a segregated community." Before the agency could take race into consideration in selecting tenants for public housing, however, it would have to meet a heavy burden. *Id.* at 1136. In *Otero,* on remand, it would have to provide "convincing evidence" that "a color-blind adherence" to the priority regulation involved there "would almost surely lead to eventual destruction of the racial integration that presently exists in the community." *Id.* at 1135–36. Stated differently, it would have to show that following its priority regulation, rather than taking race into account, "would probably lead to eventual ghettoization of the community." *Id.* at 1136. Otherwise, the agency's denial of housing because of a family's race would constitute unlawful discrimination. *Id.* At a trial, on remand,

> the parties would be permitted to offer evidence as to the relevant community, the impact of adherence to the priority regulation, including the declining white population in that community, the effect of transfers from other locations in the community to the [project in issue], estimates as to the total racial composition of the Urban Renewal Area upon completion, and the racial composition of the available population that is eligible for public housing.

*Id.* at 1137.

*Otero* does not aid the Bedford Gardens defendants. The HDA has not even argued that it acted to prevent the alleged "tipping" of the WURA toward a greater non-White population. Were it to have argued

that it took race into account to promote integration, it would not have prevailed. The evidence would not meet the heavy burden mandated by *Otero.* Particularly, the record lacks the objective evidence necessary before a court may allow an agency to take race into account to prevent "ghettoization." More generally, the credible evidence in this case establishes that the HDA had no overall plan of integration. Tr. 422–24 (testimony of Sargeant); Tr. 457 (testimony of Long). Finally, as discussed above, to the extent that the HDA urged or mandated use of the Bedford Gardens ratio, the evidence establishes that the ratio was to constitute a goal to be achieved by "outreach," not a quota to be rigidly applied by floor, building, apartment-size, and subsidy.

The Bedford Gardens defendants also argue that all of the WURA community groups, including the WFHC, approved of the plan of integration in the various housing projects in the WURA. The record provides some support for the allegation that some community groups had reached informal agreements regarding rental in the WURA. Long testified that "there seemed to be general agreement on the part of all the community groups about the affirmative marketing goals during the period toward the tail end of the rent-up at Bedford, and just before rent-up began at Clemente." Tr. 462. Moritz referred to verbal agreements, informal agreements, and reciprocal agreements. Letters from Douglas Moritz to Congressman Fred Richmond, dated July 29 and Aug. 5, 1975, BG's Exhs. AL, AM, quoted in part at n. 17 *supra.* Moritz testified, however, that he never approved use of the Bedford Gardens ratio, that he indicated his disapproval to anyone who would listen, and that the policy of the Williamsburg Housing Association, sponsors of Clemente Plaza, was to return the WURA to a 50/50 White/non-White ratio. Tr. 536–39. To fulfill that policy, the Williamsburg Housing Association would consider rental policies at other projects in renting Clemente Plaza. Letter from Rev. Bryan J. Karvelis, Chairman of the Board of the Williamsburg Housing Association, to Laila Long, Deputy Administrator of the HDA Office of Equal Opportunity, dated May 29, 1975, Intervenor Exh. 2 (prepared in part by Moritz).

The Court would not find on the basis of this evidence that all community groups approved the Bedford Gardens rental ratio. Moreover, the evidence that does suggest informal agreements among unspecified community groups does not indicate that these groups approved the application of a 75/20/5 *quota,* as opposed to a 75/20/5 *goal* to be achieved by special "outreach" efforts. In any event, plaintiffs have provided no support for the proposition that the approval of community groups to a racial quota, assuming such approval existed, is a defense to a claim of discrimination, and the Court is aware of none. And even if the WFHC, for example, had agreed to the use of an unlawful quota at Bedford Gardens and was barred from relief on some doctrine in the nature of the "clean hands" doctrine, this bar would not extend to the other plaintiffs in the action.[26]

In partial summary, the Bedford Gardens defendants have not rebutted plaintiffs' prima facie case or established any justification for implementing a quota at Bedford Gardens. They also have not established a defense to plaintiffs' case of racial and ethnic origin discrimination.

*Injunctive Relief*

 Having found the civil rights violations described above, the Court passes to the question of the appropriate relief. Section 3612(c) of Title VIII provides that "[t]he court may grant as relief, as it deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order . . . ." The Court must bear in mind that it "has not merely the

---

**26.** The Bedford Gardens defendants also argue that they complied with HDA's instructions to follow the 75/20/5 ratio to avoid racial violence in the WURA. There is some testimony in the record, in addition to Kraus's, that suggests that racial violence in the WURA was possible. Tr. 480–81 (testimony of Long). The Court does not find that the possibility of violence *vel non* played a part in the Bedford Gardens defendants implementing a quota at Bedford Gardens, nor would such a possibility in any event constitute a defense to the racial discrimination found in this case.

power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Louisiana v. United States*, 380 U.S. 145, 154, 85 S.Ct. 817, 822, 13 L.Ed.2d 709 (1965) (voting rights violation), *quoted in Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (employment discrimination). Having given the parties the opportunity to submit evidence on the issue of injunctive relief and having considered that evidence, as well as the entire record in this case, the Court concludes that the Bedford Gardens defendants should be permanently ordered to comply with the terms of the Consent Decree.

The character and extent of the civil rights violations committed by the Bedford Gardens defendants supports the issuance of such an injunction. They applied a strict and pervasive quota on the basis of race and national origin: by apartment size, building, floor, and subsidy program. They also extended special preferences to Whites by meeting with them more frequently, assigning them nearly all of the four-bedroom apartments, allowing the UJO to designate 81 families for RAPP-subsidized apartments, and making a greater effort to attract them to Bedford Gardens. The Bedford Gardens defendants continued to apply the quota until after this litigation had been commenced and stopped doing so only on the advice of counsel. They are now acting under representations to the Court to abide the terms of their version of the Consent Decree. They represent that they will do so pending the outcome of this litigation. The limitation on this representation does not encourage the Court to believe that violations will not recur.

The Court has additional reasons to fear that, absent such an injunction, violations will recur. The Bedford Gardens defendants indicate an apparent lack of understanding of the wrongfulness of using the quota. In fact, they continue to deny that they used a quota at Bedford Gardens. The Court also notes that the Bedford Gardens defendants made broad statements about community support and encouragement for the quota and monitoring of its use at Bedford Gardens. The Court has found these statements to be, for the most part, unsupported by the credible evidence in the case.

The Bedford Gardens defendants have introduced evidence to prove that the issuance of an injunction will have a disastrous effect on their businesses. They have not established that an injunction will harm their businesses, *see* Bedford Gardens Defendants' Memorandum at 52, but they contend that they have proven a reasonable likelihood that such harm will result from an injunction. The Court is not satisfied that such extensive harm, if any, will ensue from an injunction. It concludes, in any event, that the likelihood of harm to these defendants is outweighed by the character and extent of the violations found here and the likelihood that violations will recur absent issuance of an injunction.

Enjoining the Bedford Gardens defendants to abide the terms of the Consent Decree is modest injunctive relief. It is relief particularly tailored to this case. The Consent Decree embodies the goal of integrated residential housing, provides for adjustment periods to attain such a goal, facilitates the flow of housing information to all members of the community, and sets forth mechanisms for resolving disputes without continuous Court supervision. *See* text *supra* & 450 F.Supp. 602 (S.D.N.Y.1978).

## CONCLUSION

The Court concludes that the Bedford Gardens defendants have discriminated in the rental of Bedford Gardens in violation of section 3604 of Title VIII, Title VI, 42 U.S.C. § 2000d, 42 U.S.C. §§ 1981 & 1982, as well as applicable rules and regulations.

The Court has also concluded that a permanent injunction is appropriate. Accordingly, it directs the Bedford Gardens defendants to obey permanently the terms of the Consent Decree that has been in force against the consenting parties.[27]

So ordered.

27. The Court recognizes that there may be further proceedings to this action, although it encourages the parties to reach amicable agreements where possible.